**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

In the Matter of the Use of A Cell-Site
Simulator to Identify a Cellular Device
in a Narcotics Trafficking Case

22 M 615

Magistrate Judge Sunil R. Harjani

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court is another warrant application involving the use of modern surveillance technology that sweeps broadly and captures information about individuals both involved and uninvolved in suspected criminal activity. This Court has previously addressed unique issues associated with the use of geofence data obtained from Google to identify the suspect of a crime, but which also captures location data of those uninvolved in any criminal activity. *See In the Matter of the Search Warrant Application for Geofence Location Data Stored at Google Concerning an Arson Investigation* ("*In re Geofence Location Data*"), 497 F.Supp.3d 345 (N.D. Ill. 2020). Here, the Court is presented with a warrant application that implicates the same concerns. The present warrant application seeks to use a cell-site simulator to ascertain the phone number of a Subject Phone used by an individual suspected to be engaged in narcotics trafficking. The use of a cell-site simulator, much like geofence and cell tower dumps,[1] casts a wide net over a particular area to capture all data within that location. As a result, the use of this technology raises specific concerns that impact the Court's Fourth Amendment analysis.

---

[1] A geofence request to Google seeks to obtain all location data of individuals who have connected to a Google application within a certain zone identified in a warrant, such as on the date and at the location of an arson crime. A cell tower dump request seeks to obtain identifying information of all cell phones that had a connection to a particular cell tower at a certain date and time of suspected criminal activity.

The question before the Court is how best to ensure Fourth Amendment principles of particularity and the prohibition against overbreadth warrants are upheld in approving a warrant for the use of a cell-site simulator. The balance the Court must strike is to ensure that the search warrant authorizes a search that is reasonable but that also does not cast too broad a net in capturing location data that includes a host of clearly uninvolved individuals. In this case, the Court has authorized the use of a cell-site simulator with a narrow scope and specific limitations that address these Fourth Amendment concerns. As further discussed below, these limitations include geographical restrictions on the government's use of the simulator within the Northern District of Illinois, restrictions on the use of resulting data obtained from the simulator, and deletion of the remaining captured data once the suspect's phone number is identified.

## BACKGOUND

On August 10, 2022, the government submitted a warrant application to this Court seeking authorization to use a cell-site simulator to identify the cell phone number of a suspect allegedly involved in narcotics trafficking.[2] According to the affidavit from a Task Force Officer with the Drug Enforcement Administration, the suspect of the crime is believed to be a source of narcotics for a drug trafficking organization. The affidavit details wiretap conversations demonstrating that the narcotics originated from the suspect, and that the suspect likely uses multiple phones for his business because certain wiretapped conversations reference other, unrecorded phone conversations and thus, likely occurred on a different cell phone line. The affidavit states that the government intends to use a cell-site simulator to locate the unknown cell phone number.

---

[2] The facts of this case are detailed in the Application and Affidavit for a Search Warrant in case number 22 M 615, which remains under seal. As a result, the Court has only generally described the crime, the suspect, and the technology at issue.

By way of background, cell phones generally communicate wirelessly over a network cellular infrastructure, which includes towers that route and connect individual communications. When sending or receiving a communication, a cell phone broadcasts signals to the cell tower that is routing its communications, and that signal includes the cell phone's unique identifiers, which is usually a series of numbers such as an international mobile subscriber identity ("IMSI") number. Law enforcement can mimic a cell tower's operations by using a cell-site simulator device. The cell-site simulator broadcasts a signal similar to a cell tower that essentially tricks nearby cell phones to connect with the simulator, thus capturing the cell phones' unique identifiers. Here, the cell-site simulator does not collect the contents of any cell phone conversations or the identity of the user of the cell phone. Rather, armed with the unique identifier from the simulator, the government can determine the subscriber/user of that cell phone through a request to the cell phone company for subscriber information associated with that unique identifier. In this way, the government can identify subscriber information and the cell phone number for all cellular devices that connected to the cell-site simulator when it was operational. As a consequence of this process, the government will also have obtained location information for all of these subscribers, *i.e.*, that those cell phones (and likely their subscribers) were located at that place and time where the simulator was used.

## DISCUSSION

The government's use of a cell-site simulator is not novel in this district, but there is a dearth of opinions that discuss the unique Fourth Amendment issues that are inherent with the use of this technology. The government's ability to use technology to conduct a search for a suspect's cell phone number is unlike other traditional types of searches. For example, premises searches

of houses, apartments, and office suites are static—their location is fixed and easily identifiable. Searches of most modern technology have similar characteristics, for example, an email account, a Facebook account, a cell phone, or a computer. These searches have fixed boundaries that can be particularly identified and the scope of the search has inherent limits as a result, such as the four walls of the premises or the data within an identified cell phone or electronic account. Those items can also be directly connected to a criminal suspect, *i.e.*, the suspect's home or his email account. In contrast, the use of a cell-site simulator to locate a particular cell phone number is not static— the simulator conducts a search for cell phone data anywhere in a particular area and anytime it is turned on by a government agent. For example, the simulator is small enough to be used in a police van that can travel from location to location. Moreover, all data in that area, regardless of whether it can be tied back to a suspect or not, is captured as a result. Thus, the search can be characterized as both roving and canvassing. As further described above, the government can use that cell phone data to identify the subscriber of that cell phone and the cell phone number. Through this process, the government discovers who was in a certain area at a certain time, which could include not only public places but also non-public places, such as homes, businesses, and churches, and thus, implicates privacy concerns of those uninvolved in any criminal activity. *See Carpenter v. United States*, 138 S. Ct. 2206, 2218 (2018) (cell-site data "provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations.") (internal quotations omitted).

The Seventh Circuit has not had occasion to evaluate in depth the characteristics of a cell-site simulator search. In *United States v. Patrick*, 842 F.3d 540 (7th Cir. 2016), the Seventh Circuit considered whether the exclusionary rule applied to the government's use of a cell-site simulator where the government did not explicitly disclose that it was using a simulator to locate the

4

defendant. The Court recognized that with the use of a cell-site simulator, "instead of collecting information on just one person . . . a cell-site simulator collects the relative location of *everyone* whose phone is induced to connect to the simulator[.]" *Id*. at 543. The Court ultimately held that the defendant who was taken into custody in a public place, where he had no legitimate expectation of privacy, could not "complain about how the police learned his location." *Id*. at 545. But in the Court's own words, "[q]uestions about whether use of a simulator is a search, if so whether a warrant authorizing this method is essential, and whether in a particular situation a simulator is a reasonable means of executing a warrant, have yet to be addressed by any United States court of appeals. We think it best to withhold full analysis until these issues control the outcome of a concrete case." *Id*. As a result, the Court did not delve into issues of particularity and overbreadth that are implicated with the use of a cell-site simulator.[3]

In this district, in *In the Matter of the Application of the United States of America for an Order Relating to Telephones Used by Suppressed*, 2015 WL 6871289 (N.D. Ill. Nov. 9, 2015), the magistrate judge addressed some of the Fourth Amendment concerns raised by the use of a cell-site simulator because of its inevitable collection of data from uninvolved individuals. In attempting to minimize these concerns, the court required the affidavit to state that the government: (a) must make reasonable efforts to minimize the capture of signals emitted from cellular telephones used by people other than the target; (b) must immediately destroy all data other than the data identifying the cellular telephones used by the target within 48 hours; and (c) is prohibited from using the data required beyond that necessary to determine the target phones. *Id*. at *4. These limitations are helpful in minimizing the collection and use of third-party data. However, the Court

---

[3]     The Seventh Circuit also addressed cell-site simulators in *United States v. Sanchez-Jara*, 889 F.3d 418, 421 (7th Cir. 2018), but only briefly on the issue of particularity by stating that "a warrant authorizing police to follow an identified phone, to see where it goes and what numbers it calls, particularly describes the evidence to be acquired."

believes that more specificity in the warrant limitations will better address the Fourth Amendment concerns associated with the use of a cell-site simulator, as further discussed below.

Before proceeding further, it is important to acknowledge what this opinion does not address. The Court need not discuss whether the use of a cell-site simulator is a search under the Fourth Amendment because that issue is not advanced by the government nor is it before the Court. The Supreme Court in *Carpenter v. United States* held that a warrant was required to obtain historical cell-site data that tracked the movements of an individual for 127 days. 138 S.Ct. 2206 (2018). Since then, the government has generally sought search warrants under the Fourth Amendment when searching for location data pursuant to the policy directives of the Department of Justice.[4] The caveat, of course, is that the Supreme Court stated in *Carpenter* that it was issuing a narrow decision and was not considering other situations that capture location data, such as real-time cell location data and cell tower dumps. *Id*. at 2220. The Seventh Circuit Court of Appeals also recently determined, in an equally narrow ruling, that the collection of real-time cell site location data of a suspect who was in a public space for a six-hour period was not a Fourth Amendment search. *See United States v Hammond*, 996 F.3d 374, 390-392 (7th Cir. 2021). However, the government has asked this Court to find probable cause and authorize a search warrant for the use of a cell-site simulator, and thus, the Court will do so in line with the general principles outlined in *Carpenter* that the search for location data implicates an individual's reasonable expectation of privacy, particularly where it reaches into non-public spaces (as it does here), and requires the government to obtain a warrant. *See Carpenter,* 138 S. Ct. at 2219 ("when the Government accessed CSLI from the wireless carriers, it invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements."); *United States v. Rosario*, 5 F.4th

---

[4]        *See* https://www.justice.gov/opa/file/767321/download (visited 8/22/2022).

706, 711 (7th Cir. 2021) ("the Supreme Court held in *Carpenter* that 'an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through [cell-site location information].'"); *see also Patrick*, 842 F.3d at 544 ("[t]he United States has conceded for the purpose of this litigation that use of a cell-site simulator is a search, so we need not tackle these questions."); *United States v. Gibson*, 996 F.3d 451, 460 (7th Cir. 2021) ("The government does not dispute that the cellphone tracking in this case amounted to a 'search' requiring a warrant, and we assume for purposes of this appeal that it did.").[5]

The Court also need not spend much time on the issue of probable cause to authorize the use of a cell-site simulator, as it is fairly straightforward and clear in this case. In examining an application for a warrant, the Court must inquire as to whether probable cause exists that a crime has been committed and that evidence of the crime will be located at the place to be searched. *Illinois v Gates*, 462 U.S. 213, 238 (1983); *United States v. Hall*, 142 F.3d 988, 995 (7th Cir. 1998). Put simply, probable cause is a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of the circumstances. *Gates*, 462 U.S. at 238. Probable cause does not require conclusive evidence that links a particular item to a crime. *United States v. Anderson*, 450 F.3d 294, 303 (7th Cir. 2006) (citation omitted). "Rather, issuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018), *cert. denied by* 140 S.Ct. 108 (2019).

Here, the agent's affidavit details wiretap conversations that establish the suspect is engaged in narcotics trafficking and references other conversations among the participants that

---

[5] To date, courts that have addressed this issue have generally concluded that the government's use of a cell-site simulator requires a warrant under the Fourth Amendment. *In re Use of Cell-Site Simulator*, 531 F.Supp.3d 1 (D.D.C. Mar. 25, 2021); *United States v. Ellis*, 270 F.Supp.3d 1134 (N.D. Ca. 2017); *Jones v. United States*, 168 A.3d 703 (D.C. 2017); *United States v Lambis*, 197 F.Supp.3d. 606 (S.D.N.Y. 2016).

were not captured on the wiretap. Combined with the agent's training and experience that narcotics traffickers routinely use multiple cell numbers to conduct business, the affidavit provides probable cause that the suspect likely uses multiple cell phones to conduct narcotics trafficking, and more specifically, is using a cell phone number which the government does not have identifying information for and which is being used to perpetrate a crime.

Turning to the issue at hand—particularity and overbreadth. The Fourth Amendment requires that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The manifest purpose of this particularity requirement was to prevent general searches." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). The particularity requirement "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Id*; *see also Marron v. United States*, 275 U.S. 192, 196 (1927) ("The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another."). The particularity requirement also "ensures that the scope of a search will be confined to evidence relating to a specific crime that is supported by probable cause." *United States v. Vitek Supply Corp.*, 144 F.3d 476, 481 (7th Cir. 1998). In contrast, warrants that are "overbroad, that is, that allow officers to search for items that are unlikely to yield evidence of the crime, violate the Fourth Amendment." *United States v. Vizcarra-Millan*, 15 F.4th 473, 502 (7th Cir. 2021), *cert. denied by* 142 S.Ct. 838 (2022).

Here, the warrant has three specific limitations that address issues of particularity and overbreadth.[6] *First*, the warrant authorizes the government to use a cell-site simulator only in three

---

[6]    The government included some of these limitations in its warrant application, but at the request of the Court, amended its application to provide more specificity as discussed herein.

situations: (1) within a quarter-mile radius of the suspect's residence; (2) within a quarter mile-radius of any location where law enforcement physically sees the suspect; and (3) within a quarter-mile radius of any location where law enforcement has physically seen the suspect within the last 30 days. These geographic limitations ensure that the cell-site simulator collects information in places narrowly tailored to achieving the highest probability of obtaining location and phone data of the suspect while minimizing the collection of data of uninvolved individuals. It particularly describes the locations to be searched by tying the use of the simulator (*i.e.* the search) to specific places the suspect is likely to be present and thus, avoids a vast overcollection of data associated with uninvolved individuals. The geographic limits also ensure that the warrant satisfies any probable cause concerns because there is a fair probability that evidence of the crime will be located at the places to be searched, which are locations in which the suspect is observed or frequents. *See, e.g., United States v. Tutis*, 216 F.Supp.3d 467, 480 (D. N.J. 2016) (search warrant affidavit stated that the cell-site simulator would only be used in close proximity where the defendant was known to be). In contrast, a warrant that allows the agent to turn on the cell-site simulator anywhere in the district would be, in this Court's view, generally overbroad in that it would facilitate the collection of a vast amount of unrelated information. It would not satisfy the particularity requirement in that it would provide unfettered discretion to the government to seize data based on the agent's judgment on where it is appropriate to use the simulator. As the Supreme Court has stated, a warrant should describe the places to be searched and objects to be seized with sufficient particularity to leave "nothing . . . to the discretion of the officer executing the warrant." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (citations omitted). And, unless the affidavit had sufficient information to justify such a search across the entire district, it would likely flunk the probable cause test. Thus, by reasonably specifying the locations where the search will be

conducted, the warrant particularly describes the place to be searched, ensures that it does not run afoul of overbreadth concerns, and satisfies the probable cause standard under the Fourth Amendment.

*Second*, the warrant here provides that law enforcement "will not take further investigative steps with regards to identifiers collected pursuant to the use of the investigative device, including issuing grand jury subpoenas relating to those identifiers, until after the Target Cellular Device's identifiers have been captured by the investigative device at multiple locations and/or multiple times at a common location." This is an important provision because once the cell phone identifiers have been obtained by the cell-site simulator, the government has the ability to obtain subscriber information for any of the identifiers via the use of other processes, such as a grand jury subpoena. Thus, the mere collection of anonymous cell phone identifiers by the cell-site simulator does not adequately minimize overbreadth issues and related privacy concerns of uninvolved individuals because the government can fairly easily determine the subscribers of all those cell phones, and hence their location information. This second limitation ensures that the government will not seek subscriber information of uninvolved individuals at its whim, but rather, will take steps to ensure that when it seeks the subscriber information of individuals' cell phones (and hence their location information), it is because the identifiers have appeared at multiple locations and/or times that the suspect is seen at or frequents, making it more likely that the cell phone subscriber information received belongs to the suspect.

*Third*, the warrant states that "[o]nce investigators ascertain the identity of the Target Cellular Device, they will end the collection, and any information collected concerning cellular devices other than the Target Cellular Device will be deleted." This provision confirms that the search will end once the suspect's phone is identified, and that other data collected will not be used

in the future for other purposes not related to identifying the target phone. The reality is that even with the first and second limitations above, the government will undoubtedly collect some data about uninvolved individuals. For example, if the cell-site simulator is turned on within a quarter mile of the suspect's residence, it is likely that cell phone identifiers of all occupants in the residence, as well as some neighboring residences, will be collected. Moreover, pursuant to the warrant, the cell-site simulator may be turned on in any location where the suspect was seen in the last 30 days from the date of the warrant. Because there is no real-time information that the suspect is actually present at the time the simulator is used, it is also likely that the cell phone identifiers of some uninvolved individuals will be collected. There appears to be no method to avoid this result with the use of current cell-site simulator technology. However, as this Court has stated, "it is nearly impossible to pinpoint a search where only the perpetrator's privacy interests are impacted." *In re Geofence Location Data*, 497 F. Supp.3d at 361-362. For example, a search of a house will uncover items and records of uninvolved individuals (such as family members) who, by living at the house, will have their privacy interests also temporarily invaded as agents search for evidence of the crime in their bedrooms and closets. In the same way, as the government searches these precise geographical locations for the suspect's phone, the privacy interests of third-parties will be impacted. The issue is the reasonableness of the search; reasonableness does not require surgical precision. By identifying the end of the search as the acquisition of the suspect's cell phone number, and subsequently deleting all other data collected, this third limitation helps ameliorate overbreadth concerns inherent with the use of a cell-site simulator, protects third-party privacy interests, and thus, makes this particular search reasonable.

The Court is aware that the Supreme Court in *Dalia v. United States,* 441 U.S. 238, 257 (1979), noted that the "specificity required by the Fourth Amendment does not generally extend

to the means by which warrants are executed" and in *Richards v. Wisconsin,* 520 U.S. 385, 395 (1997), it held that courts cannot limit a warrant to foreclose a particular means of execution. The Court acknowledges these precedents but submits that the above limitations do not concern the means by which the warrant is executed. For example, the Court is not dictating the settings on the simulator, which government agency will operate the simulator, the number of agents at the scene of the search, the amount of time the simulator will be active, or whether the simulator is hidden or in plain view. Rather, the limitations above involve the locations of the search and the scope of the items to be seized—in plain English, *where the government can look and what the government can keep*. These are typical Fourth Amendment considerations with search warrants. It is no different than the Court authorizing the search of a house and ensuring that the boundaries of the house are properly identified and described and the items to be seized at the house, whether it is drug paraphernalia or financial records, are ones for which there is probable cause, are particularly described, and are not so overbroad such that they turn into the prohibited general search. *See Patrick*, 842 F.3d at 548 (Wood, J., dissenting) (in addressing the application of *Dalia* to cell-site simulators, stating "the device itself is what is at issue. Because of its capabilities, the way it was used could affect the scope and location of the search itself."). Thus, the Court believes that the limitations identified above are consistent with prevailing Fourth Amendment precedent.

The Court is also keenly aware that the opportunity to ensure a cell-site simulator warrant does not overly invade the privacy interests of innocent third-parties is at the warrant approval stage. A defendant who seeks to invoke the exclusionary rule and suppress evidence at trial for an overbroad warrant cannot rely on the invasion of privacy attributed to third-parties. *See Patrick*, 842 F.3d at 545 ("But if the problem with simulators is that they are too comprehensive, that would not lead to suppression—though it might create a right to damages by other persons whose interests

12

were unreasonably invaded. Patrick is not entitled to invoke the rights of anyone else; suppression is proper only if the defendant's own rights have been violated."). And even if particularity and overbreadth challenges to a warrant appear successful at first blush, it is often the case that the government's good faith reliance on a facially valid warrant results in upholding the search and the inapplicability of the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 922 (1984); *United States v. Carrazco-Martinez*, 2022 WL 425729 at *3 (N.D. Ill. Feb. 11, 2022) (good faith exception did not result in suppression of cell-site simulator data "[d]espite the concerns raised about the use of [cell-site simulator] devices and the thorny Fourth Amendment issues they implicate[.]").

As technology has enhanced the government's ability to surveil individuals, so too must courts develop a framework for reviewing surveillance warrants that cast a wide and broad net as a result of its operation. For the reasons stated above, the Court has granted the warrant application and authorized the use of a cell-site simulator with the specific limitations identified above.[7] The Court encourages the government to consider these limitations in future cell-site simulator applications, while understanding that each application will be considered on its own terms and that there may be justifications for broader or narrower limitations depending on the specific circumstances.

**SO ORDERED.**

Dated: August 24, 2022

_____
Sunil R. Harjani
United States Magistrate Judge

---

[7] The Court granted the warrant application and authorized the search on August 10, 2022.

13